OPINION OF THE COURT
David B. Saxe, J.
This is a special proceeding inititated pursuant to CPLR *167 article 78 for an order (1) annulling, as arbitrary and capricious, the Attorney-General’s acceptance for filing of the offering plan and first amendment thereof for the proposed condominium conversion of the premises known as 421 Hudson Street, New York, New York; or in the alternative, (2) directing that the Attorney-General of the State of New York require that the Sponsor of the condominium plan demonstrate that there were no excessive long-term vacancies in existence on the premises on the date the preliminary offering plan was submitted to the Attorney-General, (3) directing that the Attorney-General require the Sponsor to correct deficiencies in the offering plan and upon compliance to supply the tenants with a new 90-day period in which to purchase under the fully amended plan, and (4) directing the Attorney-General to investigate complaints of tenant harassment.
Individually named petitioners in this proceeding are tenants in the subject apartment building, who have not yet purchased their apartments pursuant to the intitial condominium conversion plan (red herring) dated August 25, 1986. Petitioner 421 Hudson Street Tenants Association is an unincorporated association whose members have not yet subscribed to purchase apartments located at the premises in question. Respondent Mountbatten Equities is a limited partnership sponsoring the conversion of the premises (the Sponsor).
On August 25, 1986, the Sponsor submitted the red herring to the Attorney-General. In response to this plan, the petitioners filed a complaint with the Attorney-General charging that the Sponsor had engaged in acts of intentional harassment directed at the petitioners, including the commencement of two lawsuits against two different members of the tenants association. In addition, the petitioners charged that the Sponsor had ordered maintenance and cleaning services discontinued, directed the building superintendent to illegally enter apartments of designated tenants and diverted electricity in order to defraud Con Ed. In April 1987, petitioners advised the Attorney-General of their belief that there were 27 excessive long-term vacancies in the buildings in violation of General Business Law § 352-eeee (2) (e). In May 1987, petitioners submitted further complaints to the Attorney-General. Petitioners contended that the Sponsor had failed to identify its background, failed to inform the Attorney-General of pending litigation against certain tenants, and failed to accurately describe the actual condition of the building’s balcony.
The Attorney-General rejected the Sponsor’s initial offering *168 plan on May 15, 1987. The Sponsor thereafter filed an amendment to the plan on July 15, 1987. On July 17, 1987, the Attorney-General accepted for filing the initial offering plan, as amended by the amendment, and the "Black Book”.
Petitioners contend that in accepting the Sponsor’s final plan the Attorney-General failed to adequately investigate all of their charges and failed to recognize certain continuing deficiencies. Petitioners’ objections to the plan included the following allegations. First, petitioners contend that the Sponsor misrepresented the number of rooms in the premises by including unusable space such as sleeping balconies, lofts and mezzanines. Petitioners contend that the above misrepresentation was perpetuated in order to allocate a greater than actual share of expenses to residential condominiums rather than to commercial condominiums. According to petitioners, the Sponsor overestimated residential space by over 30,000 square feet which resulted in a final allocation of 81.54% of the expenses to residential condominiums.
Secondly, petitioners contend that the Sponsor’s provision of a reserve fund did not comply with the requirements of Local Laws, 1982, No. 70 of the City of New York (Administrative Code of City of New York § 26-703 et seq.) which requires that 3% of the price be held in reserve.
Finally, petitioners contend that the Sponsor engaged in long-term policy of warehousing before the initial plan was offered in order to accumulate vacant apartments. Petitioners contend that of the 184 apartments in the buildings, in April 1987 there were 27 long-term vacancies, an amount in excess of the 10% of the total number of apartments permitted by General Business Law § 352-eeee (2) (e). Petitioners present extensive documentation as to the number of apartments that were vacant in April 1987.
The Attorney-General denies all of the allegations of the petition. He contends that his department made a thorough investigation of the petitioners’ allegations of harassment, subpoenaed the records of Con Ed and New York Telephone and took depositions of the parties involved. Upon such investigation, the Attorney-General concluded that the offering plan as amended complied with the statutory informational requirements of the Martin Act and was acceptable for filing.
On the warehousing issue, while the Sponsor alleged in the offering plan that the number of long-term vacancies was 15, upon investigation the Attorney-General concluded that 3 *169 additional apartments, listed as Sponsor-occupied, were in fact vacant apartments under General Business Law § 352-eeee (2) (e). However, since this total number falls below the 10% figure provided for by the statute, the Attorney-General concluded that the plan was acceptable for filing as amended.
General Business Law § 352-eeee (2) (e) provides in part that:
"the attorney general shall refuse to issue a letter stating that the offering statement or prospectus required in subdivision one of section three hundred fifty-two-e of this chapter has been filed whenever it appears that the offering statement or prospectus offers for sale residential cooperative apartments or condominium units pursuant to a plan unless * * *
"(e) the attorney general finds that an excessive number of long-term vacancies did not exist on the date that the offering statement or prospectus was first submitted to the department of law. 'Long-term vacancies’ shall mean dwelling units not leased or occupied by bona fide tenants for more than five months prior to the date of such submission to the department of law.”
Excessive is defined in part as a vacancy rate which is the greater of 10% or a percentage double the normal vacancy rate for the apartment building in question for a period two years prior to the date of the submission of the offering plan.
"The purpose of the statute was to prevent 'warehousing’ of apartments in order to reduce the number of subscription agreements by tenants in occupancy necessary to declare the plan effective” (Matter of Forest Vistas Co. v Abrams, 103 AD2d 730, 731, affd 64 NY2d 928). The Attorney-General is mandated by law to investigate the number and status of apartments in order to determine if the Sponsor has withheld a significant percentage from the rental market. In this case, the apartment building in question had 184 apartments at the time of filing of the plan. The Sponsor conceded that 15 of these apartments fell within the statutory definition of a long-term vacancy (i.e., vacant on or before Mar. 25, 1986). Upon investigation of the petitioners’ allegations that, in fact, 27 rather than 15 apartments were vacant, the Attorney-General determined that the building in question had 18 long-term vacancies and he thus accepted the plan for filing.
Upon reviewing the submissions by the Attorney-General, the Sponsor and the petitioners, the court finds that the Attorney-General carefully investigated the allegations of *170 "warehousing” by the tenants and properly determined that the number of long-term vacancies in the building was within the limits prescribed by General Business Law. The conclusion by the Attorney-General as to the status of the apartments alleged by the petitioners to have been warehoused was founded upon concrete evidence and was rationally based; it therefore cannot be held arbitrary and capricious as a matter of law (see, Matter of Whalen v Lefkowitz, 36 NY2d 75).
As to the petitioners’ other contentions regarding the Attorney-General’s investigation, I note that the responsibility of the Attorney-General, as regards considering a proposed offering plan for filing, is limited (see, Matter of Whalen v Lefkowitz, 36 NY2d 75, supra). Upon receipt of an offering plan, the Attorney-General "may, but is not required to, inquire into the truth, accuracy and fullness of the disclosures made” (see, Gonkjur Assocs. v Abrams, 82 AD2d 683, affd 57 NY2d 853). Thus, petitioners’ charge that the respondent Attorney-General failed to adequately look into certain misrepresentations allegedly made by the Sponsor does not constitute a basis upon which to annul its decision.
Similarly, the charge that the Attorney-General failed to investigate alleged deficiencies in the reserve fund is insufficient to invalidate the Attorney-General’s decision. As the court pointed out in 301 E. 79th St. Tenants Assn. v Abrams (NYLJ, Apr. 1, 1985, at 14, col 2 [Sup Ct, NY County]) the calculation as to the size of the reserve fund is merely an estimate; the figure may change depending upon the number of units ultimately purchased and any possible fluctuations in the purchase price. "[I]t is impossible to predict the exact amount required in reserve until the closing” (supra, at 14, col 4).
Finally, petitioners’ assertions of tenant harassment by the Sponsor, even if true, fail to form a basis for requiring rejection of the amended offering plan, as they neither establish "deficiencies” pursuant to General Business Law § 352-e (2) nor the existence of any additional long-term vacancies pursuant to General Business Law § 352-eeee (2) (e).
Accordingly, the petitioner’s request for an order annulling the Attorney-General’s acceptance of the Sponsor’s offering plan is denied. The petition is dismissed.